**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

JOHN DOE,                                    :

                                    :   **Civil Action No:**  6:20-CV-0146 (LEK/ATB)

                         :

           **Plaintiff,**            :

                         :

                         :   **COMPLAINT & DEMAND**

        **-against-**            :     **FOR JURY TRIAL**

                         :

HAMILTON COLLEGE,                            :

                         :

          **Defendant.**         :

-------------------------------------------------------------------X

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Nesenoff

& Miltenberg, LLP, as and for his Complaint against Defendant Hamilton College ("Hamilton" or

"the College" or "Defendant"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case is a prime example of the weaponization of the Title IX process at an

educational institution, swept up in the #metoo movement, facing heavy pressure from  zealous

student  body  members  to  over-correct  an  alleged  history  of  failing  to  protect  women,  by

aggressively, unfairly, and disproportionately prosecuting and punishing male students accused of

sexual misconduct, pursuant to a flawed process infected with gender bias.

2.      When Plaintiff John Doe was an undergraduate student at Hamilton College, he

engaged in consensual sexual relationships with fellow Hamilton students Jane Jones, Emily Ellis,

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

and Sally Smith.[2] On information and belief, all three women were either members of, or close friends with members of, Hamilton's student group for sexual assault survivor advocacy, known as the Sexual Misconduct and Assault Reform Taskforce ("SMART").

3.      Plaintiff and Jones dated from the Spring of 2016 through January 2017, and then had an on-and-off sexual relationship through April 2017.  Jones graduated from Hamilton in May/June 2017.

4.      Plaintiff had his first intimate encounter with Emily Ellis in May 2017.  They stayed in touch over the summer and had consensual sexual intercourse when they returned to campus in Fall 2017, but eventually decided to just be friends.

5.      In September 2017, Plaintiff began seeing Sally Smith.  He and Sally Smith had several sexual encounters during that month, until Smith ended things in early October to pursue a different relationship.

6.      As of November 2017, Plaintiff never had any indication, from any of the women, that they were uncomfortable with any of their sexual encounters with Plaintiff.  However, everything changed in the Winter of 2018

7.      From February 2018 through September 2018, Ellis, Jones, and Smith, who all knew each other either directly or indirectly, filed successive Title IX claims against Plaintiff, each alleging nonconsensual sexual intercourse with Plaintiff from a date in either the *beginning or middle* of their respective relationships with Plaintiff—in other words, all three of them admittedly had consensual sexual intercourse with Plaintiff after the alleged "assaults."  It was this pressure from the three women, egged on by SMART and its members—one of whom, despite having *no*

---

[2] All student names used herein are pseudonyms.

2

direct knowledge of any of the alleged events, served as a "witness" in the Title IX process—that encouraged Hamilton to employ a biased process designed to remove Plaintiff from campus, regardless of his actual innocence, in order to prove its dedication to protecting women on campus.

8.      On information and belief, after an incident in December 2017 between Plaintiff and Emily Ellis, Ellis was encouraged by a board member of SMART to "re-evaluate" her past history with Plaintiff, retroactively framing their first (fully consensual) sexual encounter as nonconsensual, in order to fit within the group member's conception of Plaintiff as a bad person (an opinion she had privately expressed to Plaintiff before any of the complaints were filed).  On information and belief, SMART and/or this same member was directly involved in encouraging Smith to file her later complaint.

9.      The timing and the circumstances of the complaints were highly suspect.  All three of the complaints involved late reporting of the alleged nonconsensual sexual activity: the closest report in relation to the alleged nonconsensual sexual activity was *nine months* after the fact.  *All three* women admittedly had (in fact, initiated) consensual sexual encounters with Plaintiff *after* the dates of the alleged assaults; sometimes, the *very next day*.  According to interview summaries provided by Hamilton, all three women gave verbal testimony that was internally inconsistent and directly contradicted by contemporaneous documentary evidence.  Yet Hamilton College was determined to, and eventually did, expel Plaintiff in order to quell the female students' purported concerns, despite ample evidence of their lack of credibility – including *direct evidence of blatant fabrication of claims*.

10.     The timing of the complaints also strongly indicated that the three women were either in direct or indirect communication throughout the process, together with SMART and its members. To wit: Emily Ellis filed the first complaint.  After Ellis discovered that Plaintiff had

submitted their entire text history to the Title IX office—which completely undercut her claims—Jones then filed her complaint, *despite having graduated a year earlier*. After Plaintiff, again, submitted his entire text history with that complainant to the Title IX office, which not only undercut Jones' claims but proved that she had fabricated evidence, Sally Smith then filed her complaint. By the time Hamilton was evaluating the third complaint, it seemed clear that the complainants, with the help of SMART, would likely just keep filing new claims until Hamilton expelled Plaintiff. Rather than seeing this campaign for the farce that it was, Hamilton bent to this pressure out of a desire to avoid bad press.

11. Indeed, on information and belief, for years leading up to these complaints, Hamilton had been under investigation by the U.S. Department of Education's Office for Civil Rights, at the risk of losing its federal funding, for allegedly failing to adequately respond to reports of sexual misconduct committed against female students.

12. At the same time, Hamilton's student body—in particular, its student advocacy groups, including SMART—consistently and severely criticized Hamilton for failing to formally prosecute claims of sexual misconduct and failing to expel students found responsible for sexual misconduct. Much of this criticism was expressly linked to the need to protect women and punish men.

13. In the course of Hamilton's Title IX investigations, Plaintiff was up-front and direct with the Title IX office about his interactions and relationships with each of the women, provided consistent statements to investigators, and supported his claims with reliable, objective evidence—such as comprehensive text message histories and student access card records—as well as supporting witnesses. Plaintiff also *immediately* accepted responsibility for the sole allegation that was true: that after a long night of drinking in December 2017, he asked Emily Ellis several times

4

for a hug and briefly touched her leg over her jeans (but did not actually hug her and eventually left).[3]

14.     The complainants, to the contrary, offered inconsistent and unrealistic statements that were *completely at odds* with the objective, contemporaneous evidence:  Ellis' assault claim was severely undercut by her friendly text messages to Plaintiff on the day after the alleged assault, including inviting Plaintiff to her room that afternoon and applying to live in the same housing unit as Plaintiff the next semester.  Smith's purported witnesses gave narratives that conflicted with her claims, and her claims were also directly contradicted by her own text messages.  *Jones was caught red-handed submitting doctored evidence to the investigators and telling demonstrable, bold-faced lies that Hamilton's misconduct board expressly found "troubl[ing]*."

15.     Nevertheless, in a transparent effort to repair its damaged reputation by categorically supporting women and punishing men, Hamilton College, disregarding the actual facts of the cases, found Plaintiff responsible for sexual assault against Smith, and expelled him.

16.     Further demonstrating that Hamilton's push to eradicate sexual misconduct only applied to punishing *men*, Hamilton applied a completely different standard when Plaintiff filed a counterclaim against Jane Jones.

17.     Indeed, despite considerable corroborating evidence that Jones had sexually assaulted Plaintiff in April 2017, Hamilton declined to find Jones responsible for sexual assault. To the contrary, Hamilton slapped Plaintiff with a retaliation claim for merely filing his complaint against Jones—*despite the fact that it was Hamilton's Title IX coordinator who had encouraged him to report it.*

---

[3] For this allegation alone, for which Plaintiff took responsibility and apologized, Plaintiff was suspended for an entire semester.

18.     Hamilton's disparate treatment of the female complainants compared to its treatment of Plaintiff, and the incongruous processes and standards applied to the female students compared to Plaintiff, were evident throughout the Title IX process and were based upon, and motivated by, Plaintiff's gender.  By way of example, and not limitation:

    a.  Hamilton applied different standards of proof to Plaintiff's claim against a female student versus the female students' claims against him.

    b.  Hamilton presumed the female complainants to be credible, refused to challenge their credibility, and ignored objective, concrete proof of their lack of credibility, including: (i) evidence that Jane Jones lied and deliberately altered the text message history that she presented to the Title IX investigators, and (ii) voluminous text message evidence directly contradicting Sally Smith's claim that she tried to avoid Plaintiff after the alleged incident (which evidence actually proved that Smith continuously sought out Plaintiff's company and specifically initiated subsequent sexual encounters after the purported assault).

    c.  While failing to appropriately weigh the female students' credibility issues based upon their demonstrable lies, Hamilton held that Plaintiff was less credible for such trivialities as clarifying the investigators' written summary of his interview statement – *an action which is Plaintiff's right under the relevant policies* – and relied heavily upon such "credibility" issues in finding Plaintiff responsible for assault.

    d.  Hamilton regarded the female witnesses, some of whom openly declared themselves to be "anti-[Plaintiff]," as reliable, while disregarding witness

statements from Plaintiff's male roommate—who was mutual friends with the parties.

e.  Hamilton failed to apply a presumption of innocence, and in fact, applied a presumption of *guilt* in assessing the claims against Plaintiff.  For example, when confronted with the indisputable fact that Sally Smith repeatedly pursued subsequent sexual interactions with Plaintiff after the alleged assault, and then lied about doing so, Hamilton's Harassment and Sexual Misconduct Board (HSMB) Panel stated that it was "not unreasonable that it took some time for [Smith] to come to terms with what she experienced."  In other words, the Panel presumed the allegation to be true and then reasoned its way backwards through the evidence.  The Panel did not apply this same logic when it came to Plaintiff's claim against Jones.

f.  Hamilton permitted Jane Jones to file and prosecute a patently fabricated report without repercussions, yet charged Plaintiff with retaliation for filing his own claim against Jones – despite the fact that it was the Title IX coordinator herself who had (i) encouraged Plaintiff to file the counterclaim, insisting that it would not extend the process (which it did, considerably) and (ii) informed Plaintiff that the investigators would redact certain portions of Plaintiff's testimony, which he considered essential, from the investigation report, unless Plaintiff formally pursued the counterclaim.

g.  Hamilton permitted Jane Jones, a graduated student who had no standing to make a Title IX claim at all, to pursue a baseless and clearly fabricated Title IX claim.

h. Hamilton's Title IX Coordinator redacted critical and relevant exculpatory information from the Sally Smith investigative report at the request of Smith, over Plaintiff's repeated objections, claiming that such information was not relevant; yet the HSMB Panel ultimately made findings that would have been directly impacted by the redacted information.

i. On information and belief, Hamilton permitted Sally Smith to ignore policy deadlines, allowing her to submit a response to the investigative report *weeks* past the deadline, while forcing Plaintiff to then respond to Smith's extremely belated response within essentially one business day.

j. Hamilton employed archaic and gender-normative stereotypes, presuming males to be sexual aggressors and females to be chaste.  By way of example, the HSMB Panel in the Sally Smith case found they could not resolve discrepancies between Smith's and Plaintiff's accounts of their sexual encounter; but, instead of rightly concluding that this mandated a finding of "not responsible," the investigators decided to examine external factors to gauge Plaintiff's general "interest" in the sexual act that Smith alleged was nonconsensual.  Finding that Plaintiff seemed interested in that particular sex act generally, the HSMB Panel then concluded it was more likely than not that Plaintiff assaulted Smith.  In other words, the Panel equated a male student's *general interest* in a sexual act with a likelihood that he performed that act *by force on a specific occasion*.

k. In justifying the sanction of expulsion, Hamilton insisted that Plaintiff's alleged misconduct – a nonconsensual sexual act - required a sanction with "permanent" consequences.  However, when Plaintiff first filed his complaint against Jones for

the very same offense, he was told flat out by the Title IX Coordinator that even if there were a finding of responsibility, Jones would not be subjected to any sanctions.

l.   On information and belief, while Plaintiff proved—and Hamilton acknowledged— Plaintiff's innocence on the first two complaints, Hamilton felt obligated to find Plaintiff responsible on the third complaint regardless of the actual evidence at hand, in order to avoid further criticism for allegedly failing to expel male students with multiple complaints – a specific accusation that had previously been lodged against Hamilton in its student paper, *by the very same SMART member who was directly involved in both the Ellis and Smith complaints*.

19.   Hamilton's reckless actions and omissions in permitting female students to pursue false claims against Plaintiff, while negligently refusing to properly address Plaintiff's well-supported claim against a female student, and in fact, punishing Plaintiff for filing a complaint against a female student, constitute gender bias and retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

20.   As a result of Hamilton's unlawful and discriminatory actions, Plaintiff was improperly expelled from Hamilton College in March of 2019, and his transcript now carries a permanent mark of expulsion for violation of the school's conduct policies, forever tarnishing Plaintiff's reputation and severely damaging his future educational and professional prospects.

21.   Hamilton's actions further violated Plaintiff's contractual rights as set forth in the relevant school policies.

22.   Plaintiff therefore brings this action for monetary and injunctive relief for violations of Title IX, breach of contract, and other state law causes of action.

9

## **THE PARTIES**

23.     Plaintiff John Doe is a natural person and resident of the State of Colorado.

24.     Hamilton College is a private, coeducational liberal arts college with an undergraduate student enrollment of approximately 1,850 students.  Hamilton is located at 198 College Hill Road, Clinton, New York 13323.

## **JURISDICTION AND VENUE**

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972, as well as diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

26.     This Court has personal jurisdiction over Defendant Hamilton on the grounds that it is conducting business within the State of New York.

27.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Hamilton is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.  **BACKGROUND.**

    A.  **Hamilton Faces Federal Pressure to Respond Aggressively to Complaints of Sexual Misconduct.**

28.    On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "Dear Colleague Letter" (the " DCL").   The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."  DCL at 4.

29.    Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

30.    On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

31.    Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

32.    In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in

violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

33.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014),    https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

34.    Shortly after the 2014 Q&A and the *Not Alone* report came out, Hamilton revised its sexual misconduct policy to eliminate live hearings from the adjudicative process, finding that such hearings were "unnecessarily stressful and even traumatizing."  Brian Sobotko, *Hamilton Under Federal Title IX Investigation*, The Spectator (Dec. 4, 2014).

35.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Oct. 1, 2019).

36.     Hamilton found itself on the receiving end of at least one such investigation after a complaint was lodged against it with OCR on November 14, 2014, for allegedly mishandling an allegation of sexual assault. On information and belief, the complainant in the OCR investigation was female and the respondent was male.  On information and belief, the OCR investigation was still pending during the underlying events that give rise to this action.

37.     The Hamilton community was well-aware of the OCR investigation.  *See, e.g.*, Brian Sobotko, *Hamilton Under Federal Title IX Investigation*, The Spectator (Dec. 4, 2014).  In fact, Hamilton's administration responded to the investigation by acknowledging to students that, insofar as preventing sexual misconduct, "there is more we can do to remind upper-class students. We will be looking at that population on how to create a culture on campus that doesn't allow those types of acts to occur."

38.     Despite Hamilton's initial stated belief that the OCR investigation would take "several months", it actually dragged on for *years*, with OCR investigators attending on-campus events and directly engaging with the student body to assess Hamilton's compliance and, consequently, its eligibility for federal funding.  *See* Emily Eisler, *Hamilton's response to sexual assault cases continues to be investigated*, The Spectator (Apr. 4, 2016), available at https://students.hamilton.edu/spectator/news-2015/p/hamilton-s-response-to-sexual-assault-cases-continues-to-be-investigated/view. ("This meeting happened to take place during the SAVES Sexual Assault Awareness Month and representatives from SAVES were in attendance to give a more objective knowledgeable voice to the conversation as well. . . . [A]ttendance to the forum was fairly low and all of the students in attendance were women who expressed an existing interest in the issue.").

39.     On information and belief, the OCR investigation remains pending to date.

**B.   Hamilton Balks at Prospective Due Process Requirements.**

40.     On September 22, 2017, the OCR rescinded the DCL and the 2014 Q&A and put in place new interim guidance (the "2017 Q&A). *See* Dep't of Ed*., Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

41.     As Secretary of Education, Betsy DeVos, noted, the rescission of the DCL was largely motivated by "[t]he truth . . . that the system established by the prior administration has failed too many students," specifically because "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

42.     At the same time, the DOE issued proposed new Title IX regulations, a large portion of which were intended to restore the promise of due process that the DOE recognized had been diminished by the 2011 DCL.

43.     Indeed, in January 2020, the National Association of Student Personnel Administrators (NASPA), which has 15,000 members representing more than 1500 institutions, issued a study titled, *Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct*. The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.  In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students;

and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."  While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."  The study suggests that accused students—predominantly men—are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

44.     In January 2018, Hamilton College signed onto two separate public objections to the proposed new regulations, specifically arguing that the proposed requirement for live hearings and an opportunity for cross examination—which the United States Supreme Court has referred to as "the greatest legal engine ever invented for the discovery of truth"—would create too heavy a burden on schools.

**C. <u>Hamilton Faces Student Criticism for Failing to Protect Women.</u>**

45.     The OCR investigation was not the only pressure on Hamilton to strengthen its response to complaints by female students of sexual misconduct.

46.     For several years leading up to the adjudication of the complaints involving Plaintiff, Hamilton students openly and vocally accused the College of not taking allegations of sexual misconduct seriously enough and of failing to harshly punish perpetrators of sexual assault, particularly focusing on Hamilton's failure to protect women.

47.     In 2016, Hamilton's Title IX Coordinator sent to the Hamilton Community the Harassment and Sexual Misconduct Board's (HSMB) annual report for the academic year 2015-2016.  The report summarized the results of nineteen reported violations of Hamilton's Sexual

Misconduct Policy, five of which were investigated as formal complaints. Four of those complaints were against students. One student was suspended, the rest received disciplinary points.

48.    On information and belief, all of the students found responsible for sexual misconduct referenced in the 2015-2016 HSMB report were male.

49.    There was an immediate student backlash about the lack of disciplinary action against alleged perpetrators of nonconsensual sexual contact, focusing on the need to protect women.  *See*, *e.g.*, Emily Eisler, *Students Express Anger with HSMB Report*, The Spectator (Oct. 6, 2016), available at http://students.hamilton.edu/spectator/news-2015/p/students-express-anger-and-disappointment-with-hsmb-report/view.  According to that article:

> The complaints against the HSMB ranged from social media posts to directly emailing members of the Board. It also sparked displays of campus activism: as students walked to their classes on Wednesday, it was impossible to ignore the signs posted along the bridge and across campus. Several students responded to the report through The Spectator. One anonymous student expressed her concerns about how the College punishes perpetrators of sexual assault: "I can get more points for smoking pot or having Christmas lights in my room than assaulting someone. The school does not take these crimes seriously enough."

50.    The article interviewed several students dissatisfied with the report's findings – all of whom were female students frustrated with Hamilton's inadequate punishment of male assailants.  One female student stated, "There exists an inherent issue when Hamilton College attaches a point system to sexual assault . . . It trivializes the experience of the survivor of sexual assault. Especially, when their experience is compared to that of hanging lights in a dorm room." Another confided, "I see my rapist almost every day in the dining hall, he still shows up to parties I'm at and threatens my friends; I tried to warn the girls he was with in the diner two weeks ago that he is a rapist (the first time I've ever spoken up to people besides my friends) and not only did they not believe me, but everyone in the line ignored me. I'm afraid we live on a campus that

supports sexual assault and rape."  A third female student interviewed for the article explained, "Sexual assault does not exist on a hierarchy, and I do not believe that you can assign lesser points for what our heteronormative society considers 'acceptable.' None of it is acceptable." *Id.*   Still another female student opined, "When I told my mother that I had been raped she told me that when she was in college she had been raped too. She didn't come forward. I didn't either. It's too much. Dealing with my assault is enough; I can't be interrogated about it too, especially if it's my word against his. Especially if he might not leave. Especially if he might come back and graduate. I'm not sure anything is really changing." *Id.*

51.     As the author of the article herself made clear: "The statistics are that, what, one in four women will be raped in college? And then the HSMB report comes out and it makes it harder." *Id.*

52.     As a consequence, Hamilton was under enormous pressure to show it was willing to "believe all women" and take a hard line against male students accused of sexual assault in order to dispel the notion that its campus was an unfriendly and unsafe environment for "women and girls." *See*, *e.g.*, Charlotte Bennett, *SMART: what we can do to end sexual violence at Hamilton*, The Spectator (Oct. 20, 2016), available at http://students.hamilton.edu/spectator/opinion-2015/p/smart-what-we-can-do-to-end-sexual-violence-at-hamilton/view.

53.     The author of the article posed and answered the following question: "How is Hamilton treating its women and girls?"

> If the last two weeks are any indication, Hamilton isn't doing too well. The recent campus activism has created an amazing conversation on campus. This conversation has told us a few things: We do not feel safe. We do not feel adequately protected. We want the safety of our bodies to be a priority. Time and time again, we are reminded that this is not the case.

On Oct. 3, Lisa Magnarelli, our Title IX Coordinator, emailed campus with the "Harassment and Sexual Misconduct Board: 2015-16 Report." This report highlighted the discrepancy between the prevalence of sexual violence on this campus (which, statistically speaking, is usually between 20 and 30 percent), the number of survivors reporting (only 19 reports) and the number of survivors who pursued a formal investigation (only 5!) Only one individual found responsible for a Title IX violation was suspended from campus. There was not a single expulsion.

Perpetrators of sexual violence remain on campus. They are not reported. They are not investigated. When they are investigated, they still remain on campus. Is this how a society should treat its *women and girls*? Is this how Hamilton should treat its women and girls? By finding individuals responsible for sexual violence, while still allowing them to live, eat, and study among us, are we truly safe? Are we being taken seriously? ***Is the violation, degradation, humiliation, and disrespect of the female body significant enough to Hamilton?***

*Id.* (emphasis added).

54.     The fervor on campus to push for a stronger response to reports of sexual misconduct was thus directly tied to the protection of female students.

55.     The next year, Hamilton released the 2016-2017 HSMB report.  The reception by the student body was similar to the 2016 response: open, verbal criticism of Hamilton's perceived failure to address sexual assault on campus.  *See* Barnes & Sise, *HSMB Report marked by glaring shortcomings*, The Spectator (Oct. 6, 2017), https://spec.hamilton.edu/hsmb-report-marked-by-glaring-shortcomings-763a5a808017.  As the authors put it, "In a chilling replay of last October's release of the 2015-16 HSMB report that spurred survivor activism, the Hamilton Sexual Misconduct Board and Title IX office has once again failed the members of our community most affected by these reports"- in other words, women.

56.     According to the report, out of twenty-two reports of alleged misconduct, only eight proceeded to formal resolution, and two students were expelled.  On information and belief, both of the expelled students were male.

57.     The student body responded to the expulsion of two students with disappointment: "As a campus community, we must continue to push the Title IX office to do more, not less. We must tell them that handing out sanctions to two respondents is not enough. We must do better." *Id.*

58.     In April 2018 – just one month before Jane Jones filed her complaint against Plaintiff – Hamilton held a "town hall" event addressing several campus issues, including sexual misconduct.  *See* Benjamin Katz, *Students voice concerns over mental health, sexual misconduct at Town Hall*, The Spectator (Apr. 5, 2018), available at https://spec.hamilton.edu/students-voice-concerns-over-mental-health-sexual-misconduct-at-town-hall-b85059662a97.   According to the article,

> On sexual assault and harassment, students, faculty, and staff discussed how sexual misconduct prevention programs, such as orientation programming and online information, should be focused on informing students of the consequences for sexual misconduct, rather than methods which place the burden of preventing rape on potential victims of violence. Students, faculty, and staff also explored the role of secret and underground societies in sexual misconduct, and the role of party culture at Hamilton. In addition, students, faculty, and staff complained about the lack of "blue lights" on campus, and implementing trauma-informed training for administrators, HSMB members, and campus police.

59.     A few months later, another Spectator article, addressing the recent arrest of a Hamilton student for sexual assault, observed, "While there has been a renewed national conversation about sexual assault and misconduct in light of the #MeToo movement and other awareness-building initiatives, sexual misconduct remains a prevalent and persistent problem on college campuses."   Jonina Mignon, *Hamilton student arrested by New York State Police for reported sexual misconduct*, The Spectator (Sept. 13, 2018), available at

https://spec.hamilton.edu/hamilton-student-arrested-by-new-york-state-police-for-reported-sexual-misconduct-6a2ce9948f67.

60.     At the time of this article, Hamilton had replaced the previous Title IX Coordinator – who, herself, had only taken on that role in 2015 – with an interim Title IX Coordinator, Ashley Place.  Ashley Place was the Title IX Coordinator during the investigation of the Jane Jones complaint.

61.     According to Hamilton's Dean of Students, the reason that Place was only named *interim* Title IX Director was because Place had directly expressed "no interest in the position." Bridget Lavin, *College Searches for Title IX Coordinator*, The Spectator (Oct. 5, 2017), available at https://spec.hamilton.edu/college-searches-for-title-ixcoordinator-2f04b4dbad47.

62.     Despite her apparent disinterest in the obligations of Title IX coordinator, Place was initially charged with overseeing the adjudication of the Jones complaint and Plaintiff's counterclaim.

63.     In November 2018— while both the Jones and the Smith Title IX complaints were being investigated—two female students who, on information and belief, served as either a direct witness or a "support" person to Jones and Smith, authored an op-ed in the school paper lamenting the creation of a campus sexual assault prevention group founded by men.  The article was ripe with gender-based generalizations, such as "Truthfully, in our personal experience as well as in public events recently (take Kavanaugh and President Trump) men haven't really engaged in this conversation unless it's arguing that there is no way that they or anyone they know is even capable of sexual assault."

64.     The piece continued,

> We understand that [the new group] was formed specifically to get
> men involved in the conversation and the group was formed, in part,

20

to market to them. But the fact that it has to be exclusively marketed to men, in order to gain acceptance and members, implies that men wouldn't join a group run by survivors who work to engage with the entire campus community. (This is evident in SAVES and SMART. There are very few men in either organization.) The thought behind it is troubling. And men starting their own groups in social movements isn't a new idea. There is a trend in social movements where womxn, especially womxn of color, work incredibly hard on social movements that men later take over. The womxn then end up receiving little to no credit.

. . .

given that historically a majority of perpetrators of sexual violence have been cis men, a conversation about sexual assault that only happens between cis men probably isn't productive. We're not making baseless claims when we say that men commit the majority of sexual violence. The National Sexual Violence Resource Center found that 91 percent of sexual violence victims are womxn. And on one university campus, 63.3 percent of the men who reported that they'd committed rape or attempted rape were serial offenders. That's one of the reasons why men talking alone about sexual violence doesn't make sense to us. The organization being exclusive to and led by men puts it at risk for unknowingly allowing an assailant to join, which is detrimental to their stated goals.

. . .

To us, it seems fitting that their emblem is a male lion. This is a symbol of masculine aggression and an animal that largely relies on the work of their female counterpart to survive.

65. Notably, the piece specifically focuses on the problem of "serial offenders," citing a statistic from a since-discredited study by David Lisak, titled *Repeat Rape and Multiple Offending Among Undetected Rapists*. The Lisak study focused exclusively on male assailants, failing to even acknowledge that females can commit sexual assault.

66. On information and belief, these were some of the same students who encouraged Ellis and Smith to file claims against Plaintiff. On information and belief, Smith *admitted* to the Title IX investigators that these students and/or their friends essentially convinced her after-the-fact that her intercourse with Plaintiff was not consensual.

67.     In the Summer of 2018, Ashley Place was replaced with Catherine Berryman as Hamilton's Title IX Coordinator.  On information and belief, Berryman was Hamilton's third Title IX coordinator in four years.

68.     Berryman immediately engaged with the student body to "reaffirm[] the administration's commitment to keeping individual students, as well as the entire community, as safe as possible."   [[Jonina Mignon, *Hamilton student arrested by New York State Police for reported sexual misconduct*, The Spectator (Sept. 13, 2018), available at https://spec.hamilton.edu/hamilton-student-arrested-by-new-york-state-police-for-reported-sexual-misconduct-6a2ce9948f67.

69.     On information and belief, the combination of federal pressure resulting from a years-long OCR investigation, with years of consistent, scathing student criticism specifically regarding Hamilton's failure to protect women and Hamilton's failure to address male "serial offenders", resulted in Hamilton's employment of gender-based decision-making that permeated the entire Title IX process and constituted discrimination against Plaintiff because of his male gender.

## II.    THE CHRONOLOGY OF EVENTS.

### A.  The 2016-2017 School Year

#### *Jane Jones*

70.     Plaintiff matriculated to Hamilton in Fall 2015, with an expected graduation date of June 2019.  Prior to attending Hamilton, Plaintiff had an exemplary record: he had an academic scholarship, was a national merit scholarship semi-finalist, received high school subject awards in

AP calculus and physics, achieved perfect scores on all his advanced placement (AP) tests, and was selected to be a senior student retreat leader for his high school.

71.     On information and belief, Jane Jones matriculated to Hamilton in Fall 2013 and graduated in June 2017.

72.     Plaintiff and Jones began dating in Spring 2016.  In the course of their relationship, Jones and Plaintiff had sex several times a week, some of which was in public places, such as abandoned squash courts and various administrative buildings.  The two also engaged in consensual sadomasochism and employed a "safe word" to use if either of them ever felt uncomfortable.

73.     When they were dating, Jones proposed having a causal or "open" relationship, but Plaintiff was adamant that he did want such an arrangement with Jones.  The two broke up around January 2017 because Plaintiff and Jones differed in terms of their time commitment to each other. Jones wanted an open relationship, but at the same time, expected a considerable amount of Plaintiff's time and attention.  Plaintiff felt this was not a fair or healthy arrangement for him.

74.     For several months after they broke up, Plaintiff and Jones continued to engage in a consensual sexual relationship mostly, if not exclusively, at Jones' initiation.  This arrangement caused tension between them because while Jones did not want an exclusive relationship, she still wanted Plaintiff's time and attention as if they were dating.  Plaintiff repeatedly told Jones that he wanted a clean break, but would then give in to her sexual advances and fall into a routine of casual sex until he would attempt, yet again, to draw a line and end the relationship.

75.     Even though Plaintiff repeatedly told Jones that he was not comfortable with the situation, and made numerous attempts to end their sexual relationship, Jones continually initiated sexual contact with Plaintiff.

76.     During this time period, Jones almost always initiated the sexual contact and would frequently use code words such as asking Plaintiff for a "study break," which meant that she wanted to meet up for sex.

77.     In early March 2017, Jones sent Plaintiff a list she had created of all the public places on campus where she wanted to have sex with him before she graduated.

78.     On March 8, 2017, Plaintiff was studying at the Hamilton College Library.  Jones knew that Plaintiff was at the library that night, as she had brought him a coffee earlier that day.

79.     Later in the evening, Jones approached Plaintiff in the library and asked him to take a "study break" or a "little break," which Plaintiff interpreted to mean a sex break, as it usually did.  Plaintiff initially told Jones that he was too busy and needed to study, but she prevailed upon him for a "quick" break, and he eventually agreed.

80.     Jones and Plaintiff walked to a nearby stairwell and began kissing.  They continued to walk down the stairwell towards a basement room where the two had had a sexual encounter on a previous occasion.  Neither of them spoke, and Plaintiff understood the purpose of their walk to be looking for a place to have sex.

81.     In the basement room, the two continued their sexual encounter.  At one point, Jones was facing away from Plaintiff with her body pressed back against his.  Plaintiff put his hand down Jones' pants and digitally penetrated her vagina, to which she responded positively, including turning her head around to kiss him as he did so.  Jones then turned around, placed her hands on the wall, and bent over in such a way to make sexual intercourse easier.  The two then engaged in consensual vaginal intercourse.  At no point did Jones say "no," physically indicate that she did not want to continue, or use the "safe word."  The interaction unfolded in more or less

24

the same way as their numerous previous public sex acts had in the past.  Afterward, Plaintiff returned to his studies.

82.     Later that evening, Jones sent Plaintiff text messages saying "good night! Hope you didn't stay up too late.  You're going to do so well tomorrow!" and "But I'll wish you good luck anyways."  The second message included a blushing, smiley-face image (emoji).

83.     The next morning, Jones texted Plaintiff asking if he wanted to walk to class together.  She then asked him if he wanted to spend more time together that afternoon.  Plaintiff responded that he needed to focus on work and was overwhelmed.

84.     Jones then told Plaintiff that she was unhappy about their encounter the night before because it felt "cheap" and she had "just wanted a 15-minute cuddle."  Plaintiff apologized and stated he had not intended to make her feel bad but was very busy and had tried to tell her that he was too busy.  Jones closed the conversation with "I know[.] let's just get our work done and have a good time when you sleep over tonight[.] and maybe you can throw in a massage."

85.     On or about April 10, 2017, Plaintiff told Jones, for the umpteenth time, that he could not continue a sexual relationship with her.  She responded, "if you change your mind, your presence in my bed is always welcomed."

86.     For the next few days, Jones continued to try to initiate encounters with Plaintiff.  On one particular occasion, when Plaintiff declined a social invite from Jones, she stated "I'm in public. I won't attack you".  This statement was a reference to Jones' regular attempts to initiate sexual activity with Plaintiff despite his expressed desire not to continue that form of relationship.  A few days later, Plaintiff mentioned that he had not seen his roommate since the morning, to which Jones responded, "missed opportunity[.] I could've woken you up."  This was yet another reference to Jones' initiation of sexual activity, as she would occasionally come to Plaintiff's room

and crawl into bed with him uninvited.  Plaintiff responded, "*I've started locking my door in fear of that.*"[4]

87.     Approximately a week or two after these exchanges, Jones entered Plaintiff's dorm room in the morning, without prior consent, and began performing oral sex on Plaintiff while he was asleep. Student access card records confirmed that Jones entered Plaintiff's dorm building in the morning.

88.     By definition, Plaintiff was unable to consent to this act, as he was asleep when it began.

89.     However, when Plaintiff woke up, he was physically aroused, and he then engaged in consensual sexual activity with Jones.

90.     Shortly after this event, Plaintiff discussed the situation with his roommate, P.B. Plaintiff told P.B. that he was extremely uncomfortable and "upset" with what Jones had done. Plaintiff specifically told P.B. that Jones had snuck into their room and had sexual activity with Plaintiff while he was sleeping.

91.     At the time, however, Plaintiff did not fully understand the interaction to be a sexual assault because he consented to the subsequent activity *after* he woke up.

92.     Plaintiff and Jones ended their relationship for good at the end of April/beginning of May 2017 and had minimal contact afterwards.

### *Emily Ellis*

93.     On information and belief, Ellis matriculated to Hamilton in Fall 2016, with an expected graduation date of June 2020.

_____

[4] Plaintiff and his roommate generally left their room door unlocked.

94.     Plaintiff and Ellis had become friends in the Spring of 2017, when she had a boyfriend.  However, she and her boyfriend broke up around the end of April/beginning of May 2017.

95.     Jones was an acquaintance of Ellis.  When Plaintiff and Ellis were first getting to know each other, Jones told Plaintiff that she was jealous he was being nice to Ellis, because Jones felt that Plaintiff had been an inattentive boyfriend to her.

96.     On the evening of May 5, 2017, Plaintiff and Ellis had consensual sexual intercourse in Plaintiff's room.  Both had been drinking alcohol, but were coherent and enthusiastic.  Plaintiff verbally requested Ellis' consent at each progressive step of the hookup. They had a discussion about birth control before having vaginal intercourse.  They also had a lengthy conversation after the intercourse, in which no regret was expressed. Ellis later returned to her own room.

97.     On information and belief, Jane Jones was in Plaintiff's housing unit when he and Ellis had intercourse, and a friend of Plaintiff's announced to the entire house (including an angry Jones) that Plaintiff and Ellis were alone in his room together.

98.     The next morning, Plaintiff texted Ellis, "good morning! I just slept for two nights in one. how are you feeling?" to which Ellis responded "hey good morning, glad you slept so well :) im feeling perfectly fine thanks. How are you?"  The two continued to have friendly conversation throughout the day, and Ellis then invited Plaintiff to her room that afternoon.

99.     In Ellis's room, the two had a discussion about the prior night and what it meant for the future.  Ellis mentioned that she was not looking to get into a relationship so soon after ending her previous one.  However, she told Plaintiff, "just because we can't be in a relationship now doesn't mean we can't be in the future."

100.    Plaintiff and Ellis continued to spend time together and would kiss regularly. At the end of that semester, prior to Summer break, Ellis expressed her growing romantic interest in Plaintiff as they said goodbye.

101.    Plaintiff and Ellis stayed in touch over the Summer and talked about their feelings for each other.  Ellis told Plaintiff that she was considering requesting to move into Plaintiff's campus housing the next semester.

102.    Over the summer, Ellis got back together with her boyfriend.  However, she still applied for a room in Plaintiff's housing unit, which was a 20-person communal living house.  She sought, and Plaintiff gave, his assistance and advice on applying to live there, and Plaintiff offered to help integrate her into the house community if she secured a spot.

**B.   The Fall 2017 Semester.**

103.    The 2017-2018 school year was Plaintiff's junior year at Hamilton.

104.    Ellis had applied for a room in Plaintiff's housing unit, but there was a waitlist, so she was living in a dorm at the start of the semester.

105.    Although Ellis had gotten back together with her (non-Hamilton) boyfriend over the Summer, she and Plaintiff continued to discuss their feelings for each other, and the potential for a romantic relationship between them, when they returned to campus.  They were in fairly regular communication throughout September and would occasionally kiss, but did not go further than that (until October, to be discussed *infra*).

*Sally Smith*

106.    On information and belief, Sally Smith matriculated to Hamilton in Fall 2017, with an expected graduation date of June 2021.

107.    Plaintiff and Smith became friends in September 2017.   Towards the end of the month, they had their first sexual encounter, in Plaintiff's room.

108.    During the encounter, Smith was performing oral sex on Plaintiff when suddenly, without any prior discussion, Smith placed her tongue in Plaintiff's anus.[5]   Plaintiff "jumped" and indicated he was not expecting that.   Smith ceased.   A few minutes later, again without prior consent or discussion, she placed pressure near Plaintiff's anus with her finger.   The two then transitioned to vaginal intercourse.

109.    In light of Smith's expressed interest in anal stimulation, while they were having vaginal intercourse with Smith on top of Plaintiff, Plaintiff began to penetrate Smith's anus with his finger, to which Smith responded positively.

110.    The two then switched positions, with Smith on all fours and Plaintiff positioned behind her.   Plaintiff wanted to gauge whether Smith was interested in anal sex, so he then placed his penis on her anus and waited for her to give consent.   Smith indicated she did not want to have anal sex.   Plaintiff immediately accepted this preference and the two then engaged in vaginal intercourse.

111.    After the two finished having sex, Smith explained to Plaintiff that she had had anal sex before, but wanted to wait before trying it with Plaintiff.   Plaintiff said that was fine, as he had no expectation of anal sex.

112.    The next day, Plaintiff and Smith engaged in lengthy, friendly conversation via text message throughout the day.   Smith told Plaintiff, "I'd love to meet up maybe after dinner if you

---

[5] On information and belief, Smith later acknowledged this interaction to Hamilton's Title IX investigators.   Yet, Hamilton took no action to assess whether this constituted an assault by Smith against Plaintiff.

have time." Plaintiff agreed and suggested a walk through the glen, an outdoor area on campus. Smith responded, "that sounds lovely." Plainly, Smith felt safe and comfortable enough with Plaintiff after their first encounter to make plans to go for a walk alone with him into the woods at night.

113.   When Smith and Plaintiff met up that evening, they decided to walk together to a location that Hamilton students had nicknamed the "field of dreams."

114.   The "field of dreams" was a cornfield that Hamilton students would occasionally go to for outdoor socializing or stargazing. For some parts of the year, the corn stalks were actively growing, and for some parts of the year the field was ploughed, but still rough, with the dried ends of the cornstalks sticking up from the ground. When Plaintiff and Smith were there, the field was ploughed and rough.

115.   In the field, Plaintiff and Smith began kissing and another sexual encounter ensued.

116.   Because of the cold night and the rough terrain, Plaintiff and Smith kept most of their clothes on. Plaintiff lay on the ground with his jacket on to help cushion the uncomfortable ground. The two removed their pants just enough to make intercourse possible. Smith was on top of Plaintiff and the two began having vaginal intercourse.

117.   At one point while the two were having intercourse, with Smith on top, Plaintiff's penis slipped out of Smith's vagina. As he reached in the dark to re-enter Smith's vagina, he mistakenly thrust his penis into her anus. Smith reacted and Plaintiff immediately withdrew and apologized for the mistake. The two resumed having vaginal intercourse.

118.   After the two were finished, they walked back to campus together.

119.    Later that night, Plaintiff texted Smith a link to an article in *The Atlantic* he had mentioned to her previously.  Smith responded in the early hours of the next morning, "I will read sometime today!! Thank you[.]"

120.    Once again, the two engaged in lengthy, friendly text messaging throughout the next day and the following weeks.  Smith expressed a clear interest in further sexual encounters with Plaintiff as well as positive feelings about him, including sending him messages such as "I wish I was riding the you train," "goodnight sweet pea," and "I can't wait [to sleepover.]"

121.    From the end of September through the first week of October, Plaintiff and Smith engaged in several more consensual sexual encounters, including an encounter where Plaintiff asked Smith beforehand, "would you be up for being blindfolded[?]", to which Smith replied "I'd be up for blindfolding."  Once again, Smith's actions clearly indicated she was enthusiastic about sexual intercourse with Plaintiff and had a great deal of trust in him.

122.    On or about October 4, 2017, Smith told Plaintiff that she had been seeing someone else and was interested in pursuing that relationship, meaning she did not want to continue the relationship with Plaintiff.  Plaintiff understood, but his feelings were hurt, so he asked Smith for some space in order to process his feelings.  Smith responded, "no worries.  I'll give you as much space as you need."

**_Emily Ellis, Continued_**

123.    As previously stated, when Ellis and Plaintiff first came back to campus after the Summer of 2017, they had engaged in some discussion of a possible relationship and had kissed on a few occasions.  Shortly after Plaintiff first slept with Sally Smith, Emily Ellis told Plaintiff that she wanted to be in a relationship with him.  However, Plaintiff told Ellis at the time that he

31

did not want to be exclusive with her.  Plaintiff then gave Ellis some space, and mostly stopped contacting her.

124.    Around the middle/end of October, 2017, Emily Ellis reached out to Plaintiff for the first time in a few weeks.  She stated that she missed their friendship and Plaintiff's presence in her life.  Plaintiff stated that he also wanted to be friends, and had just been giving her space. The two began talking again, and kissed on one occasion.

125.    Around this same time, a room opened up for Ellis in Plaintiff's housing unit.  The two stayed in touch as Ellis decided whether or not to take the room.  Ellis then decided to take it and was slated to move in at the end of October 2017.  Plaintiff offered to help get people together to assist with the move.

126.    The night before Ellis moved into Plaintiff's house, she and Plaintiff ran into each other at a party.  Although Ellis had arrived at the party with another guy, she confessed to Plaintiff that she still had feelings towards him, and kissed him.  Ellis and Plaintiff had consensual sex that night, and Ellis moved in the next day.  The two did not have sex again after that.

127.    Throughout the rest of the semester, while living in the same house, Ellis expressed a continued interest in a romantic relationship with Plaintiff.  Plaintiff had told Ellis that he did not want to be in an exclusive relationship with her, and they agreed to just see how things developed. They kissed a few times after that, but did not progress into anything serious.

128.    Throughout the Fall semester, as these events with Smith and Ellis were unfolding, Plaintiff found himself suffering with severe depression and social anxiety.  Unfortunately, he began to use alcohol to try to cope with his feelings.

129.    On one occasion in early December 2017, while severely intoxicated and depressed, Plaintiff approached Ellis in the kitchen of their shared house, stood very close to her, touched her

hip on the outside of her clothing, and repeatedly asked her for a hug (hereinafter, "the kitchen incident").  Plaintiff ultimately did not hug Ellis and left the kitchen.  However, because of Plaintiff's size (Plaintiff is approximately 6'3") and his intoxication level, and on information and belief, because of Ellis' family history with alcoholism, Ellis was extremely upset about the incident, and decided to leave their mutual house a few days later.

130.    Plaintiff stopped drinking immediately after the kitchen incident and made plans to move into substance-free housing.[6]

131.    The "kitchen incident" became a much-discussed topic in Plaintiff's housing unit and peripheral friend group, with several students—including mutual friends of Plaintiff, Ellis and Jones—immediately villainizing Plaintiff as a danger to women.

132.    One of these friends—the same one who wrote an article in the school paper decrying the creation of a male-focused assault prevention group—told Plaintiff that in light of his behavior in the kitchen, Ellis was "re-thinking" some of their previous sexual interactions.

### C. __The Campaign to Expel Plaintiff__

133.    A day or two after the kitchen incident, Plaintiff and Jones were both attending a memorial event in New York City for a mutual friend's father who had just passed away.

134.    Plaintiff avoided Jones for most of the day, but she sent him a text message asking him to come speak with her before he left.

135.    Plaintiff obliged Jones's request and met up with her separately to talk.  Jones immediately initiated a lengthy invective about all of Plaintiff's failings as a boyfriend and as a person.  Jones rehashed every slight, every argument from their prior relationship—such as one

---

[6] Plaintiff abstained entirely from alcohol for almost two months, and drank in moderation thereafter.

occasion where Plaintiff chose to play cards with his friends instead of being with Jones—and told Plaintiff that he thinks he is a good person, but he is not.  She made a brief reference to Plaintiff upsetting friends of hers, but did not elaborate.  Notably, *nowhere* in this lengthy critique did Jones make *any* mention of any nonconsensual interaction.

136.    The next day, Jones sent Plaintiff a follow-up text message, stating "I wish I could say it was good to see you, but our conversation left me angry and upset. . . . [a]ll I want is a sincere apology. . . . I know apologies are difficult – so please take as much time as needed.  I just really need to hear acknowledgment of and accountability for your words and behavior in order for us to move forward."[7]

137.    Plaintiff did not issue Jones the apology she demanded, in part because of the many apologies he had already made to Jones in the past regarding any tension between the two of them.  As far as Plaintiff was concerned, the relationship was long-over and further apology did not seem necessary.

138.    The series of questionable Title IX complaints filed by Ellis, Jones, and Smith, followed shortly after this incident.

**The First Title IX Complaint**

139.    In February 2018, Emily Ellis filed a complaint with Hamilton's Title IX office, alleging a "nonconsensual sexual act" relating to her and Plaintiff's *first* sexual encounter *nine months earlier*, in May 2017.  Ellis alleged she could not consent by virtue of intoxication.  Ellis also filed a complaint for sexual harassment for the kitchen incident.

---

[7] By "words and behavior", Jones was referring to her numerous complaints about Plaintiff's subpar performance as a boyfriend.

34

140.    Plaintiff denied the sexual assault claim and provided testimony as well as concrete evidence in support – such as Ellis's friendly "good morning" text from the morning after the alleged assault, her invitation for Plaintiff to come to her room the next day, her subsequent decision to move into the same housing as Plaintiff, their subsequent consensual sexual encounter, and Ellie's continued pursuit of a relationship with Plaintiff through the Fall 2017.

141.    With respect to the kitchen incident, Plaintiff accepted full responsibility.

### *The Pile-On Begins*

142.    During the Ellis investigation, Plaintiff provided the Title IX office with a complete history of his text messages with Ellis.  This evidence made fairly clear that Ellis's sexual assault claim was completely false.

143.    Right around this time—in May 2018—Jane Jones then filed her own complaint with Hamilton's Title IX office, despite having no grounds to do so, as she had graduated a year earlier and was no longer entitled to processes reserved for active students.  In her strategically timed complaint, Jones alleged that her sexual encounter with the Plaintiff in the library *fourteen months earlier* was nonconsensual.

144.    In the course of the Jones investigation, as a means of proving important context to Jones' allegations, Plaintiff described his sexual history with Jones to the Title IX investigators, which included the occasion in April 2017 when Jones entered his dorm room without consent and started performing oral sex on him while he was asleep.

145.    When Plaintiff explained the incident to the Title IX investigators, he was informed that such activity could constitute a violation of Hamilton's sexual misconduct policy and asked whether he wished to purse a formal claim against Jones.  Plaintiff initially stated he did not.

### *Victories and Setbacks for the Complainants*

146.    In June 2018, Plaintiff was rightly found not responsible on Ellis's belated and unsupported sexual assault allegation.  Plaintiff was found responsible for the sexual harassment charge, as he had readily admitted responsibility for the kitchen incident and that his behavior was not acceptable.

147.    Hamilton's HSMB Panel then considered what Plaintiff's sanction should be for the kitchen incident.

148.    Despite the fact that Plaintiff was found *not responsible* on the assault charge, and despite the fact that Plaintiff complied throughout the Title IX process, took responsibility for the kitchen incident, had independently taken proactive steps to remedy his alcohol issues, and had no previous disciplinary history, Hamilton's HSMB Panel determined that the harassment charge for this *single incident* warranted a one semester suspension, to be imposed during the Fall 2018 semester.

149.    In supplying the rationale for the imposition of the suspension, the HSMB Panel stated that such suspension comported with "precedent" for a sexual harassment violation. However, according to Hamilton's later-released 2017-2018 HSMB report, this claim is false: the only other student found responsible for sexual harassment in the 2017-2018 school year was given probation.

150.    On information and belief, the decision to suspend Plaintiff was improperly influenced by the mere existence of the other complaint and the pressure that Hamilton had been under to severely punish men accused of misconduct and to remove "repeat offenders" from campus.

151.    In July 2018, Hamilton's Associate Vice President for Student Affairs agreed with the HSMB Panel, and imposed the one-semester suspension, along with a required alcohol assessment and counseling.

### *Reinforcements and Retaliation*

152.    A few weeks later, Plaintiff was contacted via email by Ashley Place, the interim Title IX Coordinator, and asked whether he wanted to pursue a formal complaint against Jones for the April 2017 encounter where she performed oral sex on him while he was sleeping.

153.    Plaintiff met via phone with Ashley Place and Catherine Berryman, Hamilton's new Title IX coordinator, to discuss the matter.   Plaintiff expressed his worry that filing a complaint might complicate matters procedurally and extend the process. Plaintiff was assured that "counterclaims" were a regular occurrence, that his complaint would be handled as a part of the larger investigation, and that filing a complaint would not extend the process.

154.    Berryman and/or Place also told Plaintiff that, if he did not pursue the claim as a formal complaint, they would redact all of the information about this incident from the Title IX investigative report, despite the fact that it was clearly relevant as to Jones' view of the library incident immediately after the event itself – she continued to pursue Plaintiff sexually for weeks, strongly indicating he did not assault her in March 2017.

155.    After further deliberation, and wanting to make sure that his side of the story was fairly heard, Plaintiff confirmed to Berryman that he would pursue a formal counterclaim against Jones.  The claim was formalized on or about August 24, 2018.

156.    In response to Plaintiff's counterclaim, Jones complained to Hamilton's Title IX office that his complaint was an act of retaliation.  In mid-September 2018, Catherine Berryman,

the very same person who met with Plaintiff and vetted his counterclaim for formal adjudication, then formally charged Plaintiff with retaliation for filing his claim against Jones.

157.    Just two weeks later, Smith suddenly filed a Title IX complaint against Plaintiff, alleging that Plaintiff committed nonconsensual anal penetration on the first two occasions when they slept together, *a year earlier*.

158.    Smith would later acknowledge that she was encouraged to file her claim by a mutual friend of Jones and Ellis who was involved in SMART.  A witness would later confirm that *after* Smith heard about the Jones and Ellis complaints and after she was encouraged by SMART to "re-think" the interactions, she became "stressed" about the situation and decided to report.  That same SMART member then served as a "witness", despite having no actual contemporaneous knowledge of the relevant events.

159.    In November 2018, Hamilton notified Plaintiff that because of the pending Title IX investigations, he was being placed on interim suspension until the complaints were resolved.

160.    The Title IX investigations then dragged on for months, derailing Plaintiff's education and destroying any possibility for him to graduate on schedule.

***Outcomes***

161.    In December 2018, Plaintiff was rightly found not responsible on the Jones complaint.  This result was reached in large part because of the blatant credibility issues with

38

Jones' claims, the voluminous evidence provided by Plaintiff, and the clear improper motive of Jones' professed lingering anger with Plaintiff about their relationship.

162.    However, despite evidence of Jones' fabrication and bad faith in filing a false complaint, which evidence the HSMB Panel admittedly found "troubl[ing]," Hamilton took no action against Jones.

163.    Worse still, despite considerable corroborating evidence of Plaintiff's assault claim against Jones, and despite Jones' demonstrable lack of credibility, Hamilton refused to find Jones—the rare, female respondent—responsible for any misconduct.

164.    With the Ellis and Jones claims against Plaintiff having been thoroughly disproven by the documentary evidence, mandating findings in Plaintiff's favor, Hamilton's last opportunity to expel Plaintiff lay in its disposition of the Smith case.

165.    In January 2019, Hamilton seized that opportunity, finding Plaintiff responsible for sexual assault for the "field of dreams" encounter with Smith, despite the Panel's *admission* that it could not make a determination about whose version of events was more credible (which, in itself, was ridiculous, as Plaintiff's story was entirely corroborated by contemporaneous evidence and Smith's claims were significantly contradicted by the objective evidence).[8]  The HSMB Panel recommended expulsion.

166.    In March 2019, Hamilton's Dean of Students accepted the Panel's findings and recommendation, and expelled Plaintiff effective immediately.  Plaintiff appealed both the finding and the sanction.  In April 2019, Plaintiff's appeal was denied.

---

[8] Plaintiff was found not responsible on the alleged assault occurring during his and Smith's first sexual encounter, the day before the "field of dreams" incident. In that situation, too, the Panel concluded that they could *not* determine whose account was more credible, but that even accepting Smith's version of the events as true, they did not constitute an assault.

167.    Plaintiff has exhausted his administrative options with Hamilton, and this lawsuit represents Plaintiff's only recourse to reverse the false and inappropriate findings and right the wrongs occasioned by Hamilton College.

## III.    HAMILTON'S IMPROPER AND BIASED TITLE IX PROCESSES.

168.    Hamilton's investigation and adjudication of the Jones and Smith complaints evidenced a bias against Plaintiff because of his gender and a pre-determined outcome to support the female complainants and expel Plaintiff regardless of the facts of the cases.

### *Hamilton Ignored the Female Complainants' Credibility Issues*

169.    In both the Jones and Smith cases, the female complainants made statements that were completely at odds with the evidence and, at times, conflicted with their own statements. Yet, the investigators and HSMB Panels failed to weigh these credibility issues in assessing the claims.

170.    There was abundant evidence that Jones was not credible and had brought her post-graduation complaint in bad faith.  By way of example, and not limitation:

a.    Jones asserted that she would never have consented to the library encounter because she was "extremely uncomfortable being intimate in public places", and in particular, would not have had sex in the library basement room as it was "dusty." These statements were *directly* contradicted by the text records from Jones, which included a list *that Jones created* of public places on campus where she wanted to have sex with Plaintiff, as well as testimony from her own witnesses confirming that she and Plaintiff had engaged in sexual activity in the library on a previous occasion, and Jones' own later admission that she and Plaintiff had had sex on the

abandoned squash courts—which were indoors, but dilapidated and filthy—on multiple occasions.

b. Jones also changed her testimony several times over the course of the investigation: first, she claimed that Plaintiff had led the way down the stairs towards the basement, and looked back at her expectantly, leading her to follow him.  She then claimed that Plaintiff physically pulled her downstairs by the hand.  She initially claimed that she told Plaintiff "no" "three times" during the encounter, but then admitted to the HSMB Panel that she *never* verbally indicated non-consent.

c. Jones claimed that Plaintiff was the constant initiator of their sexual encounters, while the text record evidence between the two of them showed the opposite – that Jones was almost *universally* the initiator, and that Plaintiff had made multiple statements to her about not wanting to continue their sexual relationship.

d. Perhaps the most egregious example of Jones' lack of credibility was her presentation to the HSMB Panel of doctored text messages, in order to convey a false sense that she had confronted Plaintiff after the library encounter with a claim that it was nonconsensual.   In that regard, she provided a version of their conversation from the next day where she expressed that she was unhappy about their encounter, but deleted the individual, interceding messages from herself inviting Plaintiff over that very night.  Plaintiff, on the other hand, offered into evidence his full text history and even offered to provide his SIM card from his phone to prove his submission of the correspondence was unaltered.  The HSMB Panel acknowledged that Jones's deletions "changed …the tenor of the conversation."

171.    While the HSMB Panel appropriately found that Jones's patent lies about the library encounter required a finding that Plaintiff had not committed sexual assault, the HSMB Panel failed to carry her credibility issues into their consideration of Plaintiff's counterclaim.

172.    Indeed, Plaintiff's claim was independently corroborated by: (i) Jones's student access card records, which showed her entering Plaintiff's dorm building in the morning during the time period when Plaintiff alleged the assault occurred; (ii) the text messages between the two, where Jones expressly mentioned going to Plaintiff's room in the morning and he responded that he had started "locking [his] door in fear of that"; and (iii) the contemporaneous outcry witness, Plaintiff's roommate, who confirmed that Plaintiff told him in April 2017 that Jones had entered their room without consent and initiated nonconsensual sexual activity while Plaintiff was sleeping.

173.    Yet, despite the abundance of independent and corroborative evidence, the HSMB Panel declined to find Jones responsible, concluding that "there was not enough substantive evidence to support the complaint."

174.    Apparently, a male outcry witness does not constitute evidence, while Jones' female witnesses, some of whom openly declared themselves to be "anti-[Plaintiff]," were considered reliable.

175.    On information and belief, the Panel's refusal to hold a female student responsible for sexual assault in spite of objective corroborating evidence from multiple sources, and in spite of the female student's proven credibility issues, is indicative of Hamilton's general directive and pattern of applying the sexual misconduct policy against men for the protection of women, and not vice-versa.

176.    Similarly, the investigators and HSMB Panel assigned to the Smith case also failed to adequately consider Smith's glaring credibility issues.  By way of example, and not limitation:

a. Smith initially told investigators that on the night of the "field of dreams" encounter, she was fully naked and face-down on the ground, while Plaintiff pinned her down by the wrists and forcefully anally penetrated her as she repeatedly said "no," and that he eventually stopped, and the two then resumed having vaginal intercourse.  Smith's witnesses stated that Smith claimed Plaintiff either *attempted* to penetrate her anally or pressured her repeatedly for anal sex, and that Smith said no, cried, pushed Plaintiff off of her, and ran away in order to escape.  Yet Smith told the investigators that after the alleged assault, she and Plaintiff continued having vaginal intercourse and walked back to Plaintiff's dorm together.  Clearly, each version of the events is entirely incompatible with the other.  The Panel failed to address these numerous inconsistent claims.

b. Smith's claim that she was pinned to the ground, shirtless, on her stomach, was inconsistent with the physical layout of the field of dreams, which was rough and rocky terrain; there was no way that Smith's version of events could have occurred without her suffering considerable bruising and scratching, which Smith did not have.

c. Smith also told the investigators that the reason for her lengthy delay in reporting was because the encounter was "not a textbook definition of sexual assault," and "it was not until [she] had a support system to affirm [her] feelings of discomfort were justified" that she decided the encounter was a sexual assault.  This statement is also entirely incompatible with Smith's claim that she was forcefully held down

and repeatedly penetrated while she verbally objected – such a claim could not be *more* textbook. The true reason for Smith's delay in reporting is that there was no assault, she was never held down, and Plaintiff never engaged in anything against her will; Smith was simply manipulated into re-interpreting the events many months after the fact to support the other complainants in trying to get Plaintiff kicked off campus.

d.  Smith claimed that after the field of dreams incident, she avoided Plaintiff, as she was not comfortable being around him. Like with Jones, this account was completely contradicted by the text records, where she sent him flirty and affectionate messages in the days immediately following the encounter, admittedly engaged in numerous subsequent sexual encounters with Plaintiff, and even engaged in blindfolding and was enthusiastic about Plaintiff tying her up during sex. Yet, the Panel reasoned that Smith's claims were somehow corroborated by *her own statement* to the Title IX investigators that she declined to sleep at Plaintiff's dorm *that night*. In other words, the Panel accepted Smith's blatantly uncorroborated claims over the *objective, concrete, documentary evidence disproving her allegation*.

177.  Despite all of the above, the investigators and the HSMB Panel declined to find that Smith had any credibility issues.

178.  To the limited extent that the Panel even acknowledged Plaintiff's arguments about Smith's credibility, their response was plainly oriented towards defending Smith and aligning her claims with an explanation, rather than neutrally evaluating her credibility. For example:

a. In response to Plaintiff's argument that Smith's lengthy delay in reporting, combined with the record evidence of their numerous, consensual sexual encounters after the fact, called Smith's story into question, the Panel simply claimed it was "not unusual for a complainant to take some time to process the circumstances of an act of sexual misconduct."  In other words, the Panel simply presumed Smith to be truthful and then used their presumption that an assault took place to rebut the actual evidence to the contrary.

b. In response to Plaintiff's claim about the curious timing of Smith's complaint – a year after the alleged incident – and his belief that the complaint may have been motivated by Jones/Ellis and their mutual friends in SMART, the Panel "acknowledged that [it] may well be the case" that "[Smith]'s complaint was part of a concerted effort by a group of people to get [Plaintiff] removed from campus." Yet, the Panel simply wrote off this clear evidence of bias/motive by stating that motive to report was irrelevant to assessing whether an assault took place.

c. The Panel entirely ignored that Smith's claim that she was unsure of how to categorize the event was wildly incompatible with her various claims of being held down, continuously assaulted, crying, fighting Plaintiff off, and running away.

d. The Panel ultimately found that it could not determine what occurred during the field of dreams incident and could not factually determine whose version of the events was more credible.  This conclusion is preposterous on its face, given the numerous glaring credibility issues with Smith's story, and the absolute absence of credibility issues by Plaintiff.

179.   On the other hand, the Panel treated Plaintiff as a perpetrator from the start, seeking out any way possible to question his credibility.  For example, in the investigators' initial summary of Plaintiff's interview, they wrote that Plaintiff had reported he was "not interested in pursuing anal sex" with Smith.   Plaintiff corrected this statement during the review phase to "not *particularly* interested," to make sure the record was accurate.  The Panel would later conclude that this correction damaged Plaintiff's credibility because the Panel felt it "was used to downplay [Plaintiff]'s interest in anal sex but that the interest was there."

   a.   Not only does this conclusion indicate a patent presumption of Plaintiff's guilt, it is also nonsensical on its face: Plaintiff's correction actually changed the statement from claiming that he had no interest in anal sex (which was not an accurate reflection of his statement) to acknowledging that he had some interest. That is a clarification in the interest of truthfulness and is the opposite of "downplay[ing]" his interest.

180.   Hamilton's disparate treatment of the female complainants as opposed to Plaintiff with respect to credibility determinations can only be explained by an inherent gender bias against men and in favor of women.

### *Hamilton Relied on Gender-Normative Presumptions to Find Plaintiff Responsible*

181.     In assessing the widely divergent claims between Smith and Plaintiff, the HSMB Panel shirked its responsibilities under the Policy and instead relied on gender-normative and archaic stereotypes to render its decision.

182.     In assessing the field of dreams incident, the HSMB Panel found it could ***not*** determine whose account was more credible and could not make a factual determination of what actually took place.

183.     Faced with this (purportedly) equivocal evidence, the Panel was *obligated*, under the relevant standard of evidence, to find Plaintiff not responsible for sexual assault.  However, this would leave Hamilton in a bind, as it could not possibly find Plaintiff not responsible on all three complaints without facing severe backlash from SMART and other student groups.

184.     The HSMB Panel thus reasoned that it actually did not need to determine whose version of events was credible in order to decide whether an assault took place.

185.     Instead, as the Panel explained, "since the incidence of anal penetration is not in dispute, the Panel felt its mandate was to determine whether it was more likely or not that the penetration was intentional."  In other words, the Panel did not feel that it needed to determine the difference between Plaintiff's consistent claim of a momentary, accidental insertion that was immediately remedied, and Smith's various claims of a violent, ongoing, intentional assault.  All the Panel needed to do was assess whether Plaintiff *wanted* to have anal sex with Smith, and if the Panel found that the desire was present, that was all the evidence they needed to conclude that Plaintiff assaulted Smith.

186.     The Panel's outright *refusal* to conduct a proper factual assessment—almost assuredly because it was aware that such assessment would require a finding of no responsibility—

and **its determination instead to equate a man's *general interest* in anal sex with a *likelihood that he would anally rape a partner***, are patent evidence of gender bias and a deliberate effort by Hamilton to find Plaintiff responsible as the male accused regardless of the facts of the case.

187.    Indeed, the Panel's chosen procedure in the Smith case is especially questionable when compared to the previous Panel's assessment of Plaintiff's claim against Jones. In the Jones case, the Panel determined that Plaintiff's failure to provide sufficient details – despite the text, security, and witness evidence all supporting his claim – mandated a finding that Jones was not responsible for sexual assault. Yet, the Panel in the Smith case, after essentially acknowledging that Smith's account of the evening was not sufficiently corroborated, instead decided that it would pursue a different avenue in order to find Plaintiff responsible.

188.    Shockingly, the Panel described its decision to equate Plaintiff's interest in anal sex with his likelihood of being a rapist as simply "gauging the credibility" of the parties.

189.    The farcical nature of this claim is evidenced by the fact that the Panel then failed to engage in any genuine credibility assessment, which would have necessarily resulted in finding Smith highly noncredible. This is clear from the Panel's ultimate conclusion in finding Plaintiff responsible for sexual assault for the field of dreams encounter: "The Panel felt that the evidence . . . clearly establishes [plaintiff]'s interest in engaging in anal sex with [Smith], leading to the conclusion that it is more likely than not" that Plaintiff committed an assault.

***Hamilton Retaliated Against Plaintiff for Filing a Title IX Claim and Defending Himself***

190.    Hamilton's Sexual Misconduct Policy states, "Any individual who has experienced Sexual Misconduct has the right to make a report to Campus Safety, local law enforcement, and/or

the New York State Police" and "to be protected by the institution from retaliation for reporting an incident."

191.     After Plaintiff filed his formal complaint against Jane Jones, the very same Title IX staff who had encouraged his report then turned around and charged Plaintiff with retaliation for making the report.  Ironically, this act *in itself* was the true retaliation, punishing a male student for reporting a female assailant.

192.     The HSMB Panel in the Smith case also improperly punished Plaintiff for defending himself, viewing Plaintiff's denial of the claims against him as failure to adequately consider the female complainant's feelings, thus warranting a particularly harsh sanction.

193.     Likewise, the HSMB Panel in the Smith case also held Plaintiff's personal statement against him, finding that his statement focused on the impact that the process had on himself (which is the entire purpose of the statement), rather than reflecting on how the process affected his accuser.  Plaintiff had been directly *told* by the Title IX coordinator to focus his statement on himself, not the accuser, and was then punished for following suit.

### *Hamilton Applied Different Standards to the Female Respondent vs Plaintiff as Respondent*

194.     When the HSMB Panel in the Smith case was explaining the basis for imposing an expulsion, it stated that committing a nonconsensual sexual act "required a sanction with permanent consequences," and therefore, the lesser sanction of suspension was not appropriate.

195.     This reasoning directly conflicts with what Hamilton's Title IX Coordinator told Plaintiff when he was first considering whether to pursue his counterclaim against Jane Jones for the very same violation – a nonconsensual sexual act.  In the context of a male accusing a female, Hamilton apparently decided that no such permanent consequence was warranted.

196.    Specifically, Hamilton told Plaintiff that because Jones had already graduated, she would not face any sanction even if she were found responsible for sexual assault.

197.    On information and belief, this explanation is simply untrue.  While it is true that Hamilton could not retroactively suspend or expel Jones, it could have placed the finding in her disciplinary file and put a notation on her transcript, just as it has done for Plaintiff.

198.    On information and belief, Hamilton's statement up front that it would not sanction Jane Jones under any circumstances was motivated by her gender as a female respondent, and exemplified Hamilton's half-hearted effort at permitting Plaintiff to pursue his legitimate counterclaim.

### *Hamilton Imposed an Unduly Harsh Sanction and Selectively Enforced its Policies*

199.    In connection with Hamilton's disparate treatment of male respondents versus female respondents, Hamilton imposed an unduly harsh sanction against Plaintiff, motivated by his gender.

200.    Despite admitting that Plaintiff's alleged behavior with Smith was "*not* at the most egregious end of the scale," the HSMB Panel in the Smith case nonetheless decided that expulsion – the harshest sanction possible – was necessary.  This decision and factual conclusion are incompatible on their face.

201.    Moreover, despite the Panel's claim that a nonconsensual sexual act required a "permanent" consequence, on information and belief, the College had not expelled anyone for a nonconsensual act from at least 2013 through 2016.

202.    It was not until the 2016-2017 academic year—the year following the most vocal criticism of Hamilton's failure to expel alleged perpetrators of sexual violence against "women and girls"– that Hamilton expelled two students found responsible for nonconsensual sex.

50

203.    After Hamilton came under heavy fire from its students for failing to protect women and girls, it then began categorically expelling male students found responsible for a nonconsensual sexual act.

204.    Although the Policy states that students found responsible for sexual assault should expect "suspension *or* expulsion," on information and belief, Hamilton has instituted an unstated policy of automatic expulsion, which it adopted because of pressure from the student body.

205.    On information and belief, all of the students Hamilton expelled for nonconsensual sex since 2016 have been male.

206.    On information and belief, Hamilton has not found any females responsible for nonconsensual sexual acts or nonconsensual sexual contact, although they have been respondents in such complaints.

207.    On information and belief, Hamilton often declines to forward complaints of potential sexual assault by female students against male students for further analysis and formal adjudication – including, for example, Plaintiff's report that Smith had penetrated his anus without consent.

208.    On information and belief, Hamilton has not referred complaints against female students to law enforcement.  On information and belief, all sexual misconduct matters referred by Hamilton's Title IX office to law enforcement have been complaints against male students.

209.    On information and belief, Hamilton's appeal process is merely a rubber stamp, whereby Hamilton further justifies the actions of its Title IX staff, rather than conducting an actual, impartial assessment.  Hamilton College is in exclusive possession of information relating to appeal outcomes in its Title IX cases.  Plaintiff is not aware of any cases where a male respondent's appeal was granted.

51

IV.    **AGREEMENTS, REPRESENTATIONS, COVENANTS AND WARRANTIES BETWEEN PLAINTIFF AND HAMILTON COLLEGE.**

210.    Upon Plaintiff's acceptance to Hamilton College, Hamilton provided him with the Hamilton College Student Handbook ("the Handbook"), which contains Hamilton's various policies on student conduct, discipline, and students' rights and responsibilities, including the Sexual Misconduct Policy (the "Policy").

211.    On information and belief, the Policy is updated and reissued every year.

212.    The Policy comprises express and implied promises from Hamilton to its students, including Plaintiff John Doe, with regard to how it will address and adjudicate complaints of sexual misconduct.

213.    Throughout the investigation and adjudication of the Title IX complaints involving Plaintiff, Hamilton breached its obligations and promises under the Policy.

214.    According to the 2017-2018 Policy, "This Policy has been developed to provide recourse for individuals who believe their rights have been violated, and serves as a means to determine, after the fact and *with fairness to all involved*, if specific behaviors constitute violations of this Policy."

a.    Hamilton violated the Policy because the complaints involving Plaintiff were not resolved in a manner that was "fair" to all involved, but instead, were resolved in a way aimed to placate the female complainants and repair Hamilton's damaged reputation for failing to protect women, ignoring the relevant evidence.

215.    Under the Policy, the Title IX Coordinator is responsible for "ensuring that the College responds to such complaints in a manner that is equitable, effective, and eliminates the

harassment through remedies designed for the individual and, as needed, the entire College community."

    a.   Hamilton violated the Policy because the College did not respond to the complaints in an equitable or effective manner.  By way of example, Hamilton charged Plaintiff with retaliation for filing a claim against Jones, yet imposed no sanction on Jones for filing a baseless and provably fabricated claim against Plaintiff.

216.   According to the Policy, a "Nonconsensual Sexual Act is defined as penetration and/or oral contact, however slight, with any body part or object with the genitals or anus of another person, without affirmative consent."

217.   According to the Policy, affirmative consent is "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. . . . Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep."

    a.   Hamilton failed to abide by the Policy by refusing to find a female respondent – Jane Jones – responsible for sexual assault, despite considerable, objective evidence that she performed a sexual act on Plaintiff while he was asleep and thus, *by definition*, without consent.

    b.   Hamilton failed to apply the policy equitably, by failing to assess whether Smith violated the policy for penetrating Plaintiff's anus with her tongue without prior consent.

218.     According to the Policy, "Hamilton prohibits Retaliation against individuals who pursue complaints" under the Policy.  "Retaliation is defined as adverse action that occurs in response to a good faith disclosure or complaint of Sexual Misconduct[.]"  Further, "[a]ny individual who has experienced Sexual Misconduct has the right to make a report to Campus Safety . . . [and] to be protected by the institution from retaliation for reporting an incident; and to receive assistance and resources from the College."

     a.  Hamilton violated the Policy because it charged Plaintiff with an added violation *expressly* for filing a claim of sexual misconduct against Jane Jones—a complaint which Catherine Berryman specifically told Plaintiff he had a right to pursue.

219.     According to the Policy, upon receipt of a report of alleged misconduct, the Title IX Coordinator determines whether the alleged conduct warrants initiation of the Title IX process.

     a.  Hamilton's Title IX Coordinator abused her discretion by permitting Jones' faux "retaliation" complaint to go forward against Plaintiff as a formal charge, despite having been directly involved in Plaintiff's decision to file his counterclaim and having personal knowledge that Plaintiff's claim was made in good faith.  Indeed, Plaintiff was practically forced to make the formal complaint against Jones, because the Title IX office refused to include his full interview statement in their investigative report unless he did so.

220.     According to the Policy, the Title IX Coordinator and HSMB Chair will review the draft investigative report "to determine whether the information contained therein is relevant and material to the determination of the charged violation(s)" and "may redact information that is irrelevant, more prejudicial to a party or witness than probative, an unwarranted invasion of an individual's privacy, otherwise violative of this policy, or immaterial."

a. Hamilton violated the Policy because the Title IX Coordinator redacted relevant and material information from the Smith investigative report. Specifically, the Coordinator redacted information pertaining to Plaintiff and Smith's subsequent sexual encounters after the alleged assault, which was directly relevant to Smith's credibility.

221. According to the Policy, the parties have seven days to review and respond to the draft investigative report.

a. Hamilton violated the Policy because it permitted Smith to submit a response to the report nearly four weeks after the formal deadline.

222. According to the Policy, the parties have the right to respond to each other's comments on the investigative report.

a. The Title IX Coordinator abused her discretion in enforcing this provision of the Policy, permitting Plaintiff only one business day to respond to Smith's comments on the investigative report, despite permitting Smith to submit those comments weeks after the Policy deadline.

223. According to the Policy, the final investigative report will contain "all relevant investigation materials, Complainant and Respondent statements and responses to the other's statement, and any additional information gathered."

a. Hamilton violated the Policy because the Smith investigation did not contain all relevant materials, and in fact, had key materials redacted at Smith's request.

224. According to the Policy, the HSMB Panel "will apply a preponderance of evidence standard when arriving at a determination of whether this Policy was violated."

    a.   Hamilton violated the Policy because the Panels in the Jones and Smith cases failed to appropriately apply the preponderance of the evidence standard.

225.    According to the Policy, "[i]ndividuals found responsible for a Nonconsensual Sexual Act (penetration and/or oral contact) should normally expect suspension or expulsion from the College."

    a.   Hamilton violated the Policy because the HSMB Panel stated that a nonconsensual sexual act required a "permanent" sanction and that only expulsion could meet that requirement, thus setting forth a de facto policy of automatic expulsion.

226.    According to the Policy, "parties can expect that the College will conclude all reports of Sexual Misconduct within sixty (60) days (exclusive of appeals)."  If the process exceeds the 60-day timeline, Hamilton "will provide written notice to all parties of the reason for any delay and the expected adjustment in timeframes."

    a.   Hamilton violated this Policy numerous times, as none of the three investigations were concluded in 60 days, and Plaintiff was never provided written notice of the reason for the delays or the expected adjustment in timeframes.  In fact, the Ellis investigation took over *four months*, the Jones investigation took *seven months*, and the Smith investigation took *seven months*, exclusive of appeals, during which time Plaintiff was barred from returning to Hamilton and continuing his education.

227.    The Policy permits the parties to appeal the finding/sanction on the following grounds: (i) "A sanction inconsistent with the severity of the violation or with stated community standards and precedents;" (ii) "procedural error(s) that had a material impact on the fairness of the process"; and/or (iii) "the discovery of previously unavailable relevant information that could significantly impact the result of the Review Panel's or Senior Staff member's determination."

a. Hamilton violated the Policy because it denied Plaintiff's appeal despite Plaintiff's submission of numerous appropriate grounds to reverse the finding and sanction.

228. According to the Policy, each party to a Title IX investigation has the right to:

a. "be protected from retaliation by the institution";

b. "participate in a process that is fair, timely, impartial, and provides adequate notice and a meaningful opportunity to be heard;"

c. "have complaints investigated and reviewed in a timely, impartial and thorough manner, by individuals who have received annual training in conducting investigations of sexual violence, the effects of trauma, impartiality, the rights of the Respondent (including the right to a presumption that the Respondent is "not responsible" until a responsibility determination has been made), and other issues relating to sexual assault, domestic/dating violence and stalking;"

d. "submit a personal impact statement prior to the consideration of any sanction;"

e. "have College policies and procedures followed without material deviation;"

f. "an outcome based solely on information obtained by the Investigation Team and during the Review Panel or other applicable proceeding;" and

g. "be informed by College officials of options to notify appropriate law enforcement."

229. Hamilton violated the Policy because Plaintiff was subjected to an unfair, biased, and untimely process, which was conducted by, on information and belief, biased and insufficiently trained individuals, materially deviated from the stated policies, and was based upon Hamilton's pattern and practice of protecting women and prosecuting men rather than the relevant

57

information gathered during the investigation.  Further, Plaintiff was penalized for submitting a personal impact statement.

230.    According to the Policy, respondents in the Title IX process have the additional right to "a presumption that the Respondent is 'not responsible' until a finding of responsibility has been made."

    a.   Hamilton violated this Policy because Plaintiff was presumed guilty from the start, and the adjudication of the Smith complaint was based upon and shaped by this presumption, rather than an objective review of all relevant evidence.

231.    According to the Policy, "if the Title IX Coordinator determines that a legitimate conflict of interest exists between a member of the panel and a party to a complaint, . . . the Title IX Coordinator, in consultation with the Chair of the HSMB, will appoint a replacement[.]"

    a.   Hamilton violated this Policy because the same HSMB member presided over all three cases, creating an impermissible and insurmountable inference of bias/conflict.

## V.    PLAINTIFF'S DAMAGES.

232.    As a result of Hamilton's unlawful, gender-biased, improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Hamilton's promises to Plaintiff as an enrolled student, and deprived Plaintiff of fundamental fairness.

233.    As a result of Hamilton's unlawful, gender-biased and fundamentally unfair disciplinary process, Plaintiff was improperly suspended from Hamilton College, delaying his education for a full academic year.

234.     As a result of Hamilton's unlawful, gender-biased and fundamentally unfair disciplinary process, Plaintiff was improperly expelled from Hamilton College.

235.    As a result of Hamilton's biased, unlawful, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

236.    As a result of Hamilton's biased, unlawful, and improper conduct, Plaintiff's academic/disciplinary file and transcript are now marred by a false and baseless finding of sexual assault and expulsion.

237.    As a result of Hamilton's biased, unlawful, and improper conduct, Plaintiff will have to disclose to any future educational institution or professional program, licensing authority, or job that he applies to that he was found responsible for committing a sexual assault, conduct which carries a particularly harmful and overwhelmingly damaging stigma in today's social and political climate.

238.    As a result of Hamilton's biased, unlawful and improper conduct, Plaintiff's education and career path have been derailed, resulting in considerable economic and consequential harm.

239.    As a result of Hamilton's biased, unlawful and improper retaliation, Plaintiff was forced to defend baseless charges and was actively penalized for daring to report sexual misconduct by a female student.

240.    As a result of Hamilton's unlawful and improper conduct, Plaintiff was subjected to a gender-biased, fundamentally unfair investigation and adjudication process which destroyed his reputation, precluded him from receiving the education he was promised by virtue of his enrollment at Hamilton, and has impacted and will permanently impact his education and career prospects.

241.     As a result of Hamilton's biased, unlawful, improper conduct, Plaintiff has suffered

and will continue to suffer reputational harm, ridicule, fear, persecution, pecuniary harm,

deprivation of his education and damage to his education and career prospects.

### AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. - Erroneous Outcome**

242.     Plaintiff John Doe repeats and realleges each and every allegation above as if fully

set forth herein.

243.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No

person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity receiving

Federal financial assistance."

244.     Title IX of the Education Amendments of 1972 applies to all public and private

educational institutions that receive federal funding, including Defendant Hamilton College.

245.     Title IX is enforceable through a private right of action, for monetary damages as

well as injunctive relief.

246.     Title IX bars the imposition of university discipline where gender is a motivating

factor in the decision to discipline.  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

247.     The Second Circuit has observed that there are several theories available to a

Plaintiff alleging gender bias in violation of Title IX.  One of those theories is known as the

"erroneous outcome" theory.

248.     "Plaintiffs who claim that an erroneous outcome was reached must allege particular

facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary

proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)

249.   Hamilton violated Title IX in the instant case because Hamilton reached an erroneous finding that Plaintiff was responsible for sexual misconduct in the Smith case, and gender bias was a motivating factor in the wrongful finding.

250.   The outcome of the Smith complaint whereby Hamilton found Plaintiff responsible for a nonconsensual sexual act was erroneous because, by way of example and not limitation:

a.   Hamilton failed to properly apply the preponderance of the evidence, ignoring considerable, objective evidence in Plaintiff's favor and accepting Smith's unsupported claims over the objective evidence;

b.   Hamilton failed to question Smith's credibility and presumed her to be credible from the start, despite numerous demonstrable lies and inconsistencies in her claims;

c.   Hamilton failed to apply the presumption of innocence and presumed Plaintiff guilty from the start as a male accused;

d.   Hamilton drew adverse conclusions against Plaintiff based upon Plaintiff exercising his rights under the policy;

e.   Hamilton's Title IX coordinator redacted relevant and exculpatory information from the Smith investigation report;

f.   Hamilton permitted Smith to disregard policy deadlines, while forcing Plaintiff to comply with unreasonable deadlines;

g.   Hamilton employed archaic and gender-normative stereotypes, presuming males to be sexual aggressors and females to be chaste; specifically, Hamilton determined

that Plaintiff's *interest* in anal sex was dispositive as to whether he would *force* a partner to engage in anal sex on a specific occasion.

h.  Hamilton permitted the same Panel member to preside over separate complaints against Plaintiff, inherently biasing that member and his influence on the Panel against Plaintiff by virtue of exposure to multiple complaints;

i.  Hamilton failed to tailor the sanction to the needs of the case, instead following an unwritten policy of automatic expulsions for males found responsible for certain violations; and

j.  Hamilton failed to adequately and genuinely consider Plaintiff's appeal, instead rubber-stamping the decision below.

251.  Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings and/or the decision to impose unduly harsh discipline upon Plaintiff.  These circumstances include, by way of example and not limitation:

a.  The federal pressure placed on Hamilton by virtue of a years-long OCR investigation which put Hamilton at risk for losing federal funding;

b.  Years of pressure and criticism from the student body specifically geared towards (i) Hamilton's perceived failure to protect "women and girls" from sexual misconduct, (ii) Hamilton's perceived failure to expel all male students found responsible for any level of misconduct, and (iii) Hamilton's purported failure to expel males with multiple complaints lodged against them;

c.  Hamilton's embrace of gender-normative and gender-based stereotypes, wherein a male's interest in a sexual act was equated to a probability that the male would commit that act by force;

d.   Hamilton's disparate enforcement of the Policy and deadlines as between Plaintiff and the female complainant;

e.   Hamilton's disparate treatment of Plaintiff as a male respondent, finding that sexual assault requires a sanction with "permanent" consequences, while not applying that same logic to a female respondent;

f.   Hamilton's presumption that Smith was credible as a female complainant and Plaintiff was not credible as a male respondent; and

g.   On information and belief, since 2016, Hamilton has only found males responsible for sexual misconduct and has only expelled male students as a result, despite complaints being filed against female students as well.

252.   On information and belief, Hamilton's mishandling of Smith's complaint was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

253.   Hamilton applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

254.   Hamilton also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor.

255.   Based on the foregoing, John Doe was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

256.   This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress,

psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

257.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hamilton to: (i) reverse the outcome, findings, and sanction regarding Sally Smith's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Smith matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. - Selective Enforcement

258.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

259.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

260.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Hamilton College.

261.    Title IX is enforceable through a private right of action.

262.    To succeed on a selective enforcement claim, a plaintiff must demonstrate that gender was a motivating factor in the decision to initiate a disciplinary action and/or the severity of the punishment.

263.    Selective enforcement occurred in this case because Plaintiff's gender was a motivating factor in both Hamilton's decision to initiate proceedings and in the implementation of the unduly harsh sanction of expulsion.  By way of example, and not limitation:

a.   Hamilton was under constant student criticism to aggressively pursue sexual misconduct complaints against male students, while protecting Hamilton's "women and girls;"

b.   After a heavy student backlash in 2016 resulting from Hamilton's release of its sexual misconduct reporting and outcomes, Hamilton began uniformly expelling male students found responsible for a nonconsensual sexual act, regardless of the facts of the case;

c.   At the same time, Hamilton declined to pursue claims against female students at a similar rate and, on information and belief, has exclusively suspended and expelled male students, despite reports of misconduct against female students for similar violations;

d.   Hamilton told Plaintiff that a "permanent" sanction was a necessary outcome for his violation of the sexual assault policy, yet told Plaintiff in the Jones case that regardless of the outcome, Jones would not face any sanction;

e.   Hamilton applied different standards in analyzing Plaintiff's claim against Jones than it did for Smith's claim against Plaintiff;

    f.   Hamilton declined to find Jones responsible for sexual assault despite corroborating text messages, security card records, and contemporaneous witness testimony, yet found Plaintiff responsible for sexual assault against Smith where the Panel admitted that there was no evidence outside of the Panel's perception that Plaintiff was "interested" in anal sex and the majority of the objective evidence directly countered Smith's claims;

    g.   Hamilton selectively enforced the same policy provision as against a female respondent (Jones) and a male respondent (Plaintiff); and

    h.   Hamilton relied upon gender-normative, archaic assumptions in finding Plaintiff responsible in the Smith case.

264.    Based on the foregoing, Hamilton selectively enforced its policies based upon gender, in violation of Title IX.

265.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

266.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hamilton to: (i) reverse the outcome, findings, and sanction regarding Sally Smith's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Smith matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties

to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## AS AND FOR A THIRD CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* - Retaliation**

267.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

268.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

269.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Hamilton College.

270.    Title IX is enforceable through a private right of action.

271.    As the Supreme Court has made clear, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). "Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.* at 180.

272.    Hamilton's Sexual Misconduct Policy promises students that "[a]ny individual who has experienced Sexual Misconduct has the right to make a report" and "to be protected by the institution from retaliation for reporting an incident." The Policy further provides, "Retaliation is

defined as adverse action that occurs in response to a good faith disclosure or complaint of Sexual Misconduct."

273.    In the instant case, Plaintiff made a good faith report to the Title IX office of an incident in April 2017 wherein Jane Jones entered his dorm room without prior consent and performed oral sex on him while he was asleep.

274.    Although Plaintiff was hesitant about pursuing the complaint formally, he was specifically contacted by the Title IX coordinator to discuss filing a formal complaint.

275.    After discussing the matter with Hamilton's Title IX staff, Plaintiff filed a formal complaint for sexual misconduct against Jane Jones.

276.    In direct response to Plaintiff's complaint, the very same Title IX staff who had assisted Plaintiff in filing his report and vetted it as appropriate for formal resolution, turned around and charged Plaintiff with an added Policy violation of "retaliation."

277.    Ironically, it was this very act which, in itself, was the true retaliation, punishing Plaintiff nearly irreparably for filing a complaint against a female accuser.

278.    The imposition of a new charge against Plaintiff delayed adjudication of the Jones complaint and caused Plaintiff anxiety and mental anguish throughout the Title IX process.

279.    Hamilton College therefore improperly retaliated against Plaintiff in violation of Title IX.

280.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, and other direct and consequential damages.

281.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
**Breach of Contract**

282.     Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

283.     At all times relevant hereto, a contractual relationship existed between Hamilton and Plaintiff by virtue of Plaintiff's enrollment at Hamilton and as defined by and through Hamilton's policies and procedures governing the student disciplinary system, including but not limited to the Sexual Misconduct Policy.

284.     Through the documents it publishes and provides to students, Hamilton makes express contractual commitments to students involved in the disciplinary process and/or the reporting of potential violations of the student code of conduct.

285.     New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987); *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015).

286.     Implied in every contract is the covenant of good faith and fair dealing. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88 (1917).

287.     Based on the aforementioned facts and circumstances, Hamilton created express and implied contracts when it offered, and Plaintiff accepted, admission to Hamilton, and when Plaintiff paid the required tuition and fees.

288.     Hamilton breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of the Ellis, Jones, and Smith Title IX matters.  By way of example, and not limitation:

a.   Hamilton failed to provide a process that was fair to all involved and that was equitable and effective;

b.   Hamilton's Title IX Coordinators failed to advise Plaintiff of his right to report the Jones complaint to law enforcement;

c.   Hamilton failed to apply the presumption of innocence to Plaintiff as a male respondent;

d.   Hamilton failed to properly apply the preponderance of the evidence standard;

e.   Hamilton failed to protect Plaintiff from retaliation, and in fact, retaliated against Plaintiff;

f.   Hamilton improperly redacted relevant, probative information from the draft Smith investigative report;

g.   Hamilton declined to enforce policy deadlines against Smith, while enforcing unduly strict deadlines against Plaintiff;

h.   Hamilton failed to comply with the timeframe for adjudication set forth in the Policy or the procedures for extending such timeframe;

i.   Hamilton failed to include all relevant information in the final investigative report in the Smith matter;

j.   Hamilton failed to provide a process that was "fair, timely, impartial, and provides adequate notice and a meaningful opportunity to be heard;"

k.   Hamilton failed to provide Plaintiff with an impartial process, as the same HSMB Panel member presided over both the Jones case and the Smith case;

l.   Hamilton imposed an automatic penalty of expulsion rather than properly assessing the imposition of a suspension instead; and

70

m.  Hamilton failed to apply the appropriate standards in evaluating Plaintiff's appeal and improperly denied said appeal.

289.    Hamilton further breached the implied covenant of good faith and fair dealing, in that it applied its policies in a discriminatory way and was improperly motivated by gender bias, political expedience, and institutional self-interest in preserving/repairing Hamilton's reputation for protecting women.

290.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

291.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.


### AS AND FOR A FIFTH CAUSE OF ACTION
### Estoppel and Reliance

292.    Plaintiff John Doe repeats and realleges each and every allegation above as if fully set forth herein.

293.    Hamilton's various policies constitute representations and promises that Hamilton should have reasonably expected to induce action or forbearance by Plaintiff.

294.    Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Defendant Hamilton, by choosing to attend Hamilton rather than other schools of equal caliber.

295.    Plaintiff applied to and enrolled in the College and paid associated fees and expenses in reliance on the understanding and with the reasonable expectation that the College

would implement and enforce the provisions and policies set forth in its official publications, including Sexual Misconduct Policy.

296.    Hamilton expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Hamilton would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students and Hamilton would not deny Plaintiff his procedural and substantive rights should he be accused of a violation of Hamilton's policies.

297.    Based on the foregoing, Hamilton is liable to Plaintiff based upon promissory estoppel.

298.    As a proximate and foreseeable result of the above, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

299.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant Hamilton College as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972 (erroneous outcome), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hamilton to: (i) reverse the outcome, findings, and sanction regarding Sally Smith's complaint; (ii) expunge Plaintiff's disciplinary record with

respect to the Smith matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for violation of Title IX of the Education Amendments of 1972 (selective enforcement), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Hamilton to: (i) reverse the outcome, findings, and sanction regarding Sally Smith's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Smith matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)    On the third cause of action for violation of Title IX of the Education Amendments of 1972 (retaliation), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    On the fourth cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    On the fifth cause of action for estoppel and reliance, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    Equitable and injunctive relief directing Hamilton to: (i) reverse the outcome, findings, and sanction regarding Sally Smith's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Smith matter; (iii) remove any record of the Smith finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's

disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante; and

(vii)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated:** **New York, New York**
        **February 11, 2020**

                        **Respectfully submitted,**

                        **NESENOFF & MILTENBERG, LLP**
                        *Attorneys for Plaintiff John Doe*

                        By: /s/ Andrew T. Miltenberg
                        Andrew T. Miltenberg, Esq.
                        Stuart Bernstein, Esq.
                        Adrienne Levy, Esq.
                        363 Seventh Avenue, Fifth Floor
                        New York, New York 10001
                        (212) 736-4500
                        amiltenberg@nmllplaw.com
                        sbernstein@nmllplaw.com
                        alevy@nmllplaw.com